Argued and submitted September 6, reversed October 23, 2013

In the Matter of A. D. I.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. D. I.,
aka S. D. S.,
*Appellant.*

Lake County Circuit Court
120003JV;
Petition Number 120003A;
A153727

312 P3d 608

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Cecil A. Reniche-Smith, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

The juvenile court took jurisdiction over mother's daughter A, pursuant to ORS 419B.100(1)(c), on the ground that, because mother had been absent from A's life for several years, there was a risk that A would be psychologically damaged if she were immediately transferred to mother's custody without a transition process. Mother appeals, arguing that (1) the juvenile court erred in admitting the opinion testimony of A's caseworker that it was likely that A would be psychologically damaged if she were immediately transferred to mother's custody, (2) the state presented insufficient evidence to prove its factual allegation that mother required the assistance of the Department of Human Services (DHS) to establish a meaningful relationship with A, and (3) even if the evidence was sufficient to prove that factual allegation, the state failed to prove that immediately transferring A to mother's custody would endanger A's welfare. For the reasons explained below, we conclude that the state failed to prove that immediately transferring A to mother's custody would endanger A's welfare; that is, the state failed to prove that such a transfer could cause psychological or emotional harm to A of the severity required for juvenile court jurisdiction, much less that there was a reasonable likelihood of such harm. We therefore reverse.

The juvenile court has exclusive original jurisdiction in any case involving a minor "[w]hose condition or circumstances are such as to endanger the welfare of the [minor] or of others." ORS 419B.100(1)(c). In an appeal from a juvenile court judgment taking jurisdiction over a child pursuant to ORS 419B.100(1)(c), "[t]he question on the merits is whether DHS proved by a preponderance of the evidence that [the child's] welfare is endangered" by the parent's conduct. *Dept. of Human Services v. S. C. S.*, 253 Or App 319, 325, 290 P3d 903 (2012), *rev den*, 353 Or 428 (2013). As we explained in *Dept. of Human Services v. A. F.*, 243 Or App 379, 385-86, 259 P3d 957 (2011),

> "'[e]ndanger connotes exposure to "danger," which generally involves "the state of being threatened with serious loss or injury[.]"' *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 321, 121 P3d 702 (2005) (quoting

*Webster's Third New Int'l Dictionary* 573 (unabridged ed 2002)). Thus, for the juvenile court to have jurisdiction over a child pursuant to ORS 419B.100(1)(c), the child's condition or circumstances must give rise to a threat of serious loss or injury to the child. The threat must be current * * * [and] there must be a reasonable likelihood that the threat will be realized."

We view the evidence "in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We state the facts in accordance with that standard.

Mother gave birth to A in Washington state in November 1999. Mother and father divorced a few years later. At that time, mother was struggling with an addiction to methamphetamine, and father assumed legal custody of A. Mother participated in some supervised visits with A but stopped visiting her in 2003 or 2004. Some time thereafter, father moved with A to Oregon.

In 2006, mother gave birth to another daughter, J. Mother's continuing methamphetamine use prompted Washington's child-welfare authorities to remove J from her care in 2009. Mother successfully completed drug treatment, parenting, and counseling services and obtained stable housing by moving in with her mother. Washington child-welfare authorities returned J to mother's care in June 2012.

In February 2012, the state removed A from father's care and placed her with local paternal relatives whom she has known her entire life. On November 9, 2012, the state filed a second amended dependency petition requesting that the juvenile court take jurisdiction over A with respect to mother. The petition alleged that A was within the jurisdiction of the court with respect to mother for the following reasons:

"4.   [Mother] has a history of substance abuse which resulted in her losing custody of her daughter, [A]. [Mother] currently has an opened case with Washington State Child Welfare.

"5.   [Mother] has had no contact with her child for several years and is in need of the assistance of the Department of Human Services to help her establish a meaningful relationship with her child, [A]."

The juvenile court held a jurisdictional hearing on the allegations relating to mother on January 23, 2013. At the hearing, mother testified that, if permitted to do so, she would immediately assume physical custody of A and move her to mother's home in Washington. Mother testified that she was concerned about easing A's transition into her custody, and that she intended to research counselors and therapists who could assist A and the family. Mother testified that she had a "closely bonded, tightknit family," which included her mother, stepfather, two sisters, and two brothers. According to mother, her "huge family support system" "would help [her] fund anything that needed to be taken care of for help purposes."

Mother acknowledged that A would be justified in feeling "angry" and "confused" because mother had been absent for most of her life. Mother also recognized that A might feel "angry" and "anxious" if she were immediately transferred to mother's custody. If A were feeling that way, mother testified that she would "[d]o the best that I can. The best that I know how to do is, you know, talk with her. Do the best I can to help her understand to a level that she would understand, try to communicate with her."

At the hearing, the DHS caseworker assigned to A testified that she had spoken to A about her "familiarity with her mother" and "[w]here she would like to live at this moment in time." Based on that information, as well as her 18 years of experience as a caseworker at DHS, the caseworker opined that it would "likely" be "damaging to [A] psychologically" to be immediately placed in mother's care.

The juvenile court declined to assert jurisdiction with respect to mother on the allegation pertaining to substance abuse, but concluded that jurisdiction was warranted on the allegation pertaining to lack of contact, explaining:

"[T]he Court finds by a preponderance of the evidence that the failure to have contact for all of these years creates a

risk of psychological or emotional adverse impact to the child if there's not a transition period to Mother and Mother has no real plan."

The jurisdictional judgment was entered into the record on February 7, 2013, and this appeal followed.

On appeal, mother makes three assignments of error. First, she argues that the juvenile court erred in admitting the caseworker's testimony that it was likely that immediate placement with mother would be psychologically damaging to A. According to mother, that opinion required specialized knowledge in psychology, and the caseworker was not qualified as an expert in that field. Second, mother argues that the state failed to introduce sufficient evidence to prove its factual allegation that mother "is in need of the assistance of the Department of Human Services to help her establish a meaningful relationship with her child[.]" Third, mother argues that, even if the state introduced sufficient evidence to prove that allegation, the state failed to prove that allowing mother to assume immediate physical custody of A would endanger A by putting her at risk of serious loss or injury.

In response, the state argues, first, that the juvenile court properly admitted the opinion testimony of the caseworker, who was testifying as an expert. Second, the state argues that there is evidence in the record to support the juvenile court's findings that mother had no contact with A for several years and needs DHS's assistance to establish a meaningful relationship with A. Third, the state argues that the juvenile court did not err when it asserted jurisdiction over A with respect to mother because A was at risk of psychological harm if she were to be placed with mother without a managed transition, and mother had no specific plans for managing that transition.

We confront the question before us: whether the state presented sufficient evidence to establish that A's "condition or circumstances [were] such as to endanger [her] welfare," ORS 419B.100(1)(c); more specifically, the question is whether A's immediate transfer to mother's custody created a risk of "serious loss or injury" to A that was reasonably likely to be realized. *A. F.*, 243 Or App at 386.

As the standard identified in *A. F.* and its predecessors makes clear, in order for a juvenile court to take jurisdiction over a child on the ground that the child is endangered, the state must establish both that the child is at risk of a certain severity of harm and that there is a reasonable likelihood that the risk will be realized. To do so, the state must present evidence about both the severity of the harm and the likelihood that it will occur. In this case, it bears emphasizing that a court cannot take jurisdiction over a child based solely on a risk of *some* harm; the type, degree, and duration of the harm must be such that exposure to a reasonable likelihood of that harm justifies juvenile court jurisdiction.[1] *See State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554, 219 P3d 610 (2009) (father's drinking, which frightened his children and caused him to be mean and controlling, was "not ideal parenting," but was "not inherently or necessarily more harmful or dangerous than other varieties of parenting that would, by no stretch of the imagination, justify state intervention into the parent-child relationship").

We assume, without deciding, that the juvenile court did not err in admitting the caseworker's testimony that it was likely that A would be psychologically damaged if she were immediately transferred to mother's custody without a managed transition. We also assume, without deciding, that the juvenile court did not err in finding that the state proved that mother, if granted custody of A, would transfer A to her custody in a manner that would "create a risk of psychological or emotional adverse impact to [A]." We nevertheless conclude that the state failed to establish that such a transfer would give rise to a risk of serious loss or injury to A. In other words, the state failed to establish that the severity of the potential harm was such that juvenile court jurisdiction was justified.

We find support for that conclusion in *A. F.* and *Dept. of Human Services v. D. M.*, 248 Or App 683, 275 P3d 971

[1] By way of illustration, we note that there are many parental choices that give rise to a risk of some harm to a child, including such common choices as allowing a child to participate in certain sports. But, even if it is reasonably likely that participation in those sports will lead to some harm—such as a minor physical injury—that harm is not sufficiently severe to justify juvenile court jurisdiction.

(2012). In *A. F.*, the state alleged that the father's possession of pornography, including child pornography, endangered the children's welfare. The juvenile court took jurisdiction over the children because, it concluded, the father's possession of pornography created a risk that (1) the children would be exposed to pornography or (2) that the father would sexually abuse them. 243 Or App at 385. On appeal, we held that the evidence was legally insufficient to support either reason for taking jurisdiction. *Id.* at 388. Regarding the risk that the children would be exposed to pornography, we held:

"The state did not present any evidence that exposure to pornography would harm the children, in a way and to a degree, such that the court could take jurisdiction over them. Although we can imagine that an expert might be able to testify to that effect, the state did not present any such testimony."

*Id.* at 386. Regarding the risk that the father would sexually abuse the children, we noted that the sexual offender treatment specialist on whose testimony the juvenile court relied "testified that he needed additional information to determine whether father posed an actual risk to his children." *Id.* at 387. Thus, we concluded, the state had failed to present sufficient evidence to establish that the father's possession of pornography created a reasonable risk that he would harm his children. *Id.* at 388.

In *D. M.*, the mother appealed the juvenile court's decision to continue to exercise jurisdiction over her two children, A and I. 248 Or App at 685. When jurisdiction was first established, the mother had stipulated to the allegation that she had, at times, failed to adequately supervise the children. *Id.* The juvenile court continued jurisdiction based on its conclusion that the conditions underlying the mother's failure to provide adequate supervision persisted. *Id.* at 687. We reversed, holding that,

"although mother may or may not have been an ideal parent, at the time of the review hearing, there is *no* evidence underlying the decision to maintain wardship over A, and the evidence regarding mother's supervision of I cannot support the conclusion that she exposed the girl to 'a reasonable likelihood of harm,' much less a current threat of

serious loss or injury. Exposure to a parent's unconventional but not unlawful lifestyle [as a professional escort], receipt of lavish gifts from a parent's friends or relatives, and an unspecified amount of unsupervised access to the Internet do not justify state intervention into a parent's fundamental right to the care, control, and custody of her children."

*Id.* at 688 (emphasis in orginal).

On the record before us in this case, we conclude that there is insufficient evidence of the type, degree, and duration of any psychological damage that A might suffer if mother immediately took custody of her without a transition managed by DHS to demonstrate that such a transfer would endanger A as required by ORS 419.100(1)(c). The caseworker did not testify as to what she meant by the term "psychological damage." The caseworker also did not explain how, to what extent, or for how long A would be "psychologically damaged" by immediately moving into mother's home. "Although we can imagine that an expert might be able to testify to that effect, the state did not present any such testimony." *A. F.*, 243 Or App at 386. The state provided no evidence that the harm to A would be any greater than the customary distress that a child experiences when she is uprooted from her community and must form social bonds in a new place. *Cf. State ex rel SOSCF v. Stillman*, 333 Or 135, 152, 36 P3d 490 (2001) (holding that children's anxiety regarding their future was not "the sort of serious detriment that the legislature contemplated as providing the basis for a conclusion that a parent is unfit"); *Dept. of Human Services v. C. M. P.*, 244 Or App 221, 236, 260 P3d 654, *rev den*, 351 Or 254 (2011) (holding that "difficulty adjusting to a placement move is not extraordinary in the juvenile system—or, indeed, for many other children" and does not constitute serious detriment warranting termination of parental rights).

Under the totality of circumstances, the state failed to establish that an immediate transfer of A into mother's custody would create a threat of serious loss or injury. Even assuming that such a transfer could create a threat of some harm, the state failed to establish that the relevant harm

was sufficient to justify juvenile court jurisdiction. *A. F.*, 243 Or App at 386-88; *see also D. M.*, 248 Or App at 688 (although the mother "may or may not have been an ideal parent," the state failed to prove that the mother exposed children to threat of serious loss or injury). The juvenile court thus erred in taking jurisdiction over A with respect to mother.

Reversed.